1
 2026 CO 34 Bernard E. Sandoval, Petitioner v. City of Colorado Springs Respondent No. 24SC778Supreme Court of Colorado, En BancMay 26, 2026
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 24CA198
 
 
          
 Attorneys for Petitioner:
 
 
           Ramos
 Law Brian Hugen
 
 
          
 Northglenn, Colorado
 
 
          
 Attorneys for Respondent:
 
 
           Marc
 Smith, Acting Colorado Springs City Attorney
 
 
           W.
 Erik Lamphere, Division Chief
 
 
          
 Colorado Springs, Colorado
 
 2
 
          
 JUSTICE BOATRIGHT delivered the Opinion of the Court, in
 which CHIEF JUSTICE MARQUEZ, JUSTICE HOOD, JUSTICE GABRIEL,
 JUSTICE SAMOUR, JUSTICE BERKENKOTTER, and JUSTICE BLANCO
 joined.
 
 
          
 OPINION
 
 3
 
          
 BOATRIGHT, JUSTICE.
 
 
          ¶1
 As Bernard E. Sandoval was driving in Colorado Springs, he
 approached an intersection where his traffic signal was
 inoperative. After stopping at the unilluminated light and
 treating the intersection as a four-way stop, Sandoval
 entered the intersection, not realizing that the crossing
 lane had a green light. Corey Kinzy, traveling in that lane,
 drove through the intersection, striking Sandoval's car.
 
 
          ¶2
 Sandoval sued the City of Colorado Springs for negligence. In
 response, Colorado Springs moved to dismiss for lack of
 subject matter jurisdiction, relying on the Colorado
 Governmental Immunity Act ("CGIA"). The CGIA
 typically immunizes public entities from tort claims and
 liabilities. § 24-10-106(1), C.R.S. (2025). However, a
 public entity waives this immunity when it "fail[s] to
 repair a traffic control signal on which conflicting
 directions are displayed," and the failure
 "cause[s]" a "dangerous condition."
 § 24-10-106(1)(d)(II). Colorado Springs argued that the
 traffic signals were not "conflicting" at the time
 of the collision, meaning it had not waived sovereign
 immunity under the CGIA. The district court denied the
 motion, finding that "the traffic signals were not
 properly functioning and displayed conflicting signals to
 drivers approaching the intersection."
 
 4
 
          ¶3
 Colorado Springs appealed, and a division of the court of
 appeals reversed. Sandoval v. City of Colo. Springs,
 No. 24CA198, ¶ 1 (Oct. 31, 2024). The division held that
 the signals were not conflicting because Sandoval could have
 stopped at the inoperative light and only proceeded when
 safe, while Kinzy could have driven through his operative,
 green light. Id. at ¶ 15. It rejected
 Sandoval's argument that he permissibly treated the
 intersection as a four-way stop, noting instead that
 applicable traffic codes require a driver to treat an
 inoperative traffic signal "as a stop sign and yield to
 vehicles in or approaching the intersection."
 Id. at ¶¶ 16-17. We granted Sandoval's
 petition for certiorari review.[1]
 
 
          ¶4
 We hold that under the circumstances, the traffic control
 signals displayed conflicting directions, causing a dangerous
 condition. As a result, Colorado Springs waived its sovereign
 immunity under the CGIA. Accordingly, we reverse the judgment
 of the court of appeals and remand the case for further
 proceedings consistent with this opinion.
 
 
          I.
 Facts and Procedural History
 
 
          ¶5
 While driving northbound on South Tejon Street in Colorado
 Springs, Sandoval encountered an inoperative traffic signal
 at the intersection with East
 
 5
 
 Costilla Street. The inoperative light was unilluminated, and
 there was no other signal to direct his course of action.
 Sandoval stopped at the intersection. Unaware that the
 eastbound light on Costilla Street was still operating and
 properly cycling, Sandoval treated the intersection as a
 four-way stop and proceeded when he thought it was clear for
 his turn. Kinzy, driving eastbound on Costilla Street with a
 green light at the intersection, then struck Sandoval's
 car, injuring him.
 
 
          ¶6
 Sandoval filed negligence claims against, inter alia, the
 City of Colorado Springs. Citing section 24-10-106(1)(d)(II),
 Sandoval asserted that Colorado Springs had waived its
 immunity under the CGIA because of its "failure to
 repair a traffic control signal on which conflicting
 directions are displayed."
 
 
          ¶7
 Colorado Springs moved to dismiss for lack of subject matter
 jurisdiction, arguing that the inoperative northbound signal
 was not in conflict with the functioning eastbound signal.
 Colorado Springs contended that since motorists must treat an
 inoperative signal as a stop sign entering a through street,
 Sandoval was required to stop and yield the right-of-way.
 See § 42-4-612(1)(a), C.R.S. (2025); §
 42-4-703(3), C.R.S. (2025); City of Colo. Springs, Colo.,
 City Code, ch. 10, arts. 3, 17, §§ 10.3.101(A),
 10.17.109(A). Thus, Colorado Springs argued that Sandoval did
 not face conflicting directions because his only instruction
 was to stop and yield until it was safe to proceed.
 
 6
 
          ¶8
 The district court denied the motion to dismiss. The court
 found that because the north-south light was inoperative but
 the east-west light was properly functioning, the traffic
 signals displayed conflicting directions, creating a
 dangerous condition. As a result, the court concluded that
 the CGIA waiver applied.
 
 
          ¶9
 Colorado Springs appealed, and a division of the court of
 appeals reversed, holding that the signals did not display
 conflicting directions. Sandoval, ¶ 15. The
 division reasoned that "the inoperative traffic signal
 directed Sandoval to stop and then go when safe,
 while the green light directed Kinzy to go without
 stopping." Id. Therefore, "[b]ecause
 Sandoval and Kinzy could have followed these directions
 simultaneously without issue," the division determined
 that "the signals were not incompatible."
 Id. Additionally, the division stated that
 Sandoval's assumption -to treat the intersection as a
 four-way stop -was unsupported by any legal authority and
 contradicted the stop-sign conditions imposed by state and
 local traffic laws. Id. at ¶ 17.
 
 
          ¶10
 We granted Sandoval's petition for certiorari.
 
 
          II.
 Analysis
 
 
          ¶11
 We begin by stating the applicable standard of review. Next,
 we explain the CGIA's sovereign immunity waiver and
 principles of statutory construction. We then address when
 "conflicting directions are displayed" on a
 "traffic control
 
 7
 
 signal." § 24-10-106(1)(d)(II). Finally, we assess
 how the law, including relevant traffic laws, applies to the
 circumstances presented here.
 
 
          ¶12
 We hold that under the circumstances, the traffic control
 signals displayed conflicting directions, causing a dangerous
 condition. As a result, Colorado Springs waived its sovereign
 immunity under the CGIA. Accordingly, we reverse the judgment
 of the court of appeals and remand the case for further
 proceedings consistent with this opinion.
 
 
          A.
 Standard of Review
 
 
          ¶13
 "Whether a claim is barred on grounds of immunity under
 the CGIA is a question of subject matter jurisdiction."
 Douglas v. City & Cnty. of Denv., 203 P.3d 615,
 617 (Colo.App. 2008) (citing Fogg v. Macaluso, 892
 P.2d 271, 276 (Colo. 1995)); see also City & Cnty. of
 Denv. v. Dennis, 2018 CO 37, ¶ 10, 418 P.3d 489,
 494 ("Because the CGIA protects the government from
 suit, the district court must necessarily make factual
 findings to ensure that the court has jurisdiction to hear
 the case."). We review a court's jurisdictional
 finding as a question of law when the underlying facts are
 uncontested. Douglas, 203 P.3d at 618 (citing
 Medina v. State, 35 P.3d 443, 452-53 (Colo. 2001)).
 
 
          B.
 Sovereign Immunity Under the CGIA and Principles of Statutory
 Construction
 
 
          ¶14
 The CGIA provides public entities immunity from tort claims
 and liabilities. § 24-10-106(1). Such immunity is waived
 under certain circumstances, including,
 
 8
 
 as relevant here, when a public entity "fail[s] to
 repair a traffic control signal on which conflicting
 directions are displayed," and the failure
 "cause[s]" a "dangerous
 condition."[2] § 24-10-106(1)(d)(II). Because we
 construe statutes so that a singular term includes its
 plural, the sovereign immunity waiver applies to
 signals, not just one traffic signal. DeForrest
 v. City of Cherry Hills Vill., 990 P.2d 1139, 1144
 (Colo.App. 1999) (citing § 2-4-102, C.R.S. (2025)).
 
 
          ¶15
 We strictly construe immunity provisions since they are in
 derogation of the common law, and we broadly construe waiver
 provisions. Springer v. City & Cnty. of Denv.,
 13 P.3d 794, 798 (Colo. 2000) (citing Corsentino v.
 Cordova, 4 P.3d 1082, 1086 (Colo. 2000)). This broad
 construction principle is based "in the interest of
 compensating victims of governmental negligence."
 Douglas, 203 P.3d at 617-18 (citing
 Corsentino, 4 P.3d at 1086). And a "plaintiff
 is afforded the reasonable inferences from [their] undisputed
 evidence" in proving that the government waived its
 immunity. Dennis, ¶ 11, 418 P.3d at 494 (citing
 Tidwell ex rel. Tidwell v. City & Cnty. of
 Denv., 83 P.3d 75, 85-86 (Colo. 2003)).
 
 9
 
          ¶16
 When interpreting the CGIA, "our goal is to give effect
 to the intent of the General Assembly," primarily by
 looking to the "plain and ordinary meaning of the terms
 used." Lyons v. City of Aurora, 987 P.2d 900,
 903 (Colo.App. 1999) (citing Fogg, 892 P.2d at 274).
 Determining legislative intent requires that "we
 construe the statute as a whole, giving consistent,
 harmonious, and sensible effect to all of its parts."
 Smokebrush Found. v. City of Colo. Springs, 2018 CO
 10, ¶ 18, 410 P.3d 1236, 1240 (citing St. Vrain
 Valley Sch. Dist. RE-1J v. Loveland ex rel. Loveland,
 2017 CO 54, ¶ 11, 395 P.3d 751, 754). If the
 statute's plain language is unambiguous, we effectuate
 its ordinary meaning without further analysis. See,
 e.g., id. However, "strained or forced
 interpretation of a statutory term should not be
 adopted." Lyons, 987 P.2d at 903 (citing
 State v. Hartsough, 790 P.2d 836, 838 (Colo. 1990)).
 
 
          C.
 Understanding "Conflicting Directions" in the
 CGIA's Sovereign Immunity Waiver
 
 
          ¶17
 The CGIA does not define "conflicting." In
 Lyons, a division of the court of appeals explained
 that the term is generally defined as "being in
 conflict, collision, [or] opposition." Id.
 (quoting Conflicting, Webster's Third New
 International Dictionary (1986)). The division further
 pointed out that the verb "conflict" means "to
 show variance, incompatibility, irreconcilability, or
 opposition." Id. (quoting Conflict,
 Webster's Third New International Dictionary (1986)). In
 that case, the plaintiff claimed that the directions were
 conflicting when the pedestrian signal failed to give her
 enough time to cross six lanes of traffic before the
 traffic light
 
 10
 
 turned green, causing her to be struck by a car. Id.
 at 901-02. The division disagreed and held that the city had
 not waived its immunity because nothing suggested that the
 traffic signals "were in fact simultaneously
 showing conflicting directions." Id. at 903
 (emphasis added).
 
 
          ¶18
 That same year, another division examined this concept of
 simultaneous incompatibility in DeForrest. There, a
 driver approached an intersection and encountered both an
 operating traffic signal, which was red, and a temporary stop
 sign. DeForrest, 990 P.2d at 1141. The driver
 stopped and then entered the intersection, colliding with
 another driver, who had proceeded through a green light in
 the cross traffic. Id. The division concluded that
 these circumstances created "conflicting signals"
 under section 24-10-106(1)(d)(II), reasoning that a motorist
 in this situation "might reasonably assume that the
 temporary stop sign controlled over the direction displayed
 on the traffic light." DeForrest, 990 P.2d at
 1144.
 
 
          ¶19
 Colorado Springs points out that the division in
 DeForrest focused on conflicting signals facing one
 driver, not perpendicular drivers. But the division in that
 case also recognized that because the first driver faced both
 a traffic light and a temporary stop sign, whereas the
 perpendicular driver faced only a traffic light,
 "motorists in opposing traffic lanes were controlled by
 different types of signals . . . [which] contributed to the
 display of 'conflicting directions.'"
 Id.
 
 11
 
 (quoting § 24-10-106(1)(d)(II)). Consequently,
 DeForrest demonstrates that "conflicting
 directions" can involve perpendicular drivers facing
 different signal types.
 
 
          D.
 Application
 
 
          ¶20
 We now turn to Sandoval's circumstances. The relevant
 facts are undisputed.[3] Both Sandoval and Colorado Springs submit
 that the unambiguous plain meaning of "conflicting
 directions" supports their respective positions.
 
 
          1.
 Traffic Laws
 
 
          ¶21
 In analyzing whether traffic signals simultaneously display
 "conflicting directions," we must consider traffic
 laws and how they may apply to the scenario at hand. When a
 driver faces an intersection where the traffic control signal
 is inoperative, the motorist must comply with right-of-way
 rules for entering a through street as if there were a stop
 sign. § 42-4-612(1)(a). Those rules include stopping and
 yielding the right-of-way to any vehicle in or so closely
 approaching the intersection that it constitutes an immediate
 safety hazard. § 42-4-703(3).
 
 
          ¶22
 Based on these traffic laws, Sandoval maintains that he
 reasonably treated the intersection as a four-way stop
 because motorists must treat an inoperative
 
 12
 
 light as a stop sign entering a through street, meaning that
 when all the traffic lights are out at an intersection, it
 creates a four-way stop. Colorado Springs counters that
 Sandoval's assumption does not alter the dispositive
 question of whether the signals conflicted.
 
 
          ¶23
 The division recognized that traffic laws direct motorists to
 treat an inoperative light as a stop sign entering a through
 street, § 42-4-612(1)(a), which requires stopping and
 yielding until clear, § 42-4-703(3). Sandoval,
 ¶ 17. Thus, the division reasoned that Sandoval should
 not have treated his inoperative signal as a four-way stop.
 Id. Although the division's reasoning has merit,
 it relies on the premise that a proper interpretation of
 traffic laws allowed for compatible instructions. We must
 examine that premise and determine whether the traffic laws
 reconciled the instructions and prevented the different
 signal types from being in conflict.
 
 
          2.
 The Traffic Control Signals Displayed "Conflicting
 Directions"
 
 
          ¶24
 The question here is whether the traffic control signals
 displayed "conflicting directions" when Sandoval
 faced a blank, inoperative traffic light and the
 perpendicular driver faced a green light.
 
 
          ¶25
 The inoperative northbound traffic light and the properly
 functioning eastbound light caused drivers in perpendicular
 lanes to face different types of signals when approaching the
 intersection. Sandoval faced an inoperative signal,
 
 13
 
 which should generally be treated as a stop sign entering a
 through street, but Kinzy faced a traffic light. Although it
 is not binding authority, DeForrest recognized that
 such differing signals contribute to the display of
 "conflicting directions." 990 P.2d at 1144 (quoting
 § 24-10-106(1)(d)(II)).
 
 
          ¶26
 Further, this scenario presents a different situation than
 entering a through street from a stop sign as contemplated by
 the traffic laws because it instead created a stop sign
 perpendicular to an operating traffic light. See
 § 42-4-612(1)(a). A through street retains preferential
 right-of-way whereas a traffic light operates to
 control the right-of-way. Realistically, no
 municipality would design an intersection with a traffic
 light only operating one way while the cross traffic adhered
 to a stop sign because of the practical ramifications. This
 would create confusion for drivers. With these conditions
 presented at an intersection, a driver who had stopped at the
 stop sign and saw another driver stopped at the cross light
 could then begin to proceed through the intersection, unaware
 that the perpendicular driver could also begin to proceed as
 the light turned green. Both motorists would be entitled to
 proceed into the intersection simultaneously, causing a
 dangerous condition.
 
 
          ¶27
 Each day, motorists depend on predictability to remain safe
 on the road. For example, we expect that other cars will stop
 at red lights. And we plan accordingly. Predicting the
 actions of other drivers stems from our social contract
 
 14
 
 that we all subscribe to on the road to keep ourselves and
 others safe. Our traffic code enshrines collective rules,
 like stopping at a red light, to ensure predictability of the
 "rules of the road." § 42-4-102, C.R.S.
 (2025). The traffic code also provides solutions when, for
 example, a traffic light is out. This maintains
 predictability, our centerpiece of safety, even in those
 atypical circumstances.
 
 
          ¶28
 However, the scenario presented here removed predictability
 at the intersection. With the light malfunctioning in one
 direction, it must have become very difficult for drivers,
 like Sandoval, to predict the conduct of other drivers in the
 cross-traffic. Will they stop and then proceed as if they had
 approached a fourway stop because their light is also out?
 Will they stop until the intersection is clear? Or do they
 somehow still face an operating traffic signal and will
 immediately proceed through a green light or come to a stop
 if it is red? Drivers in this scenario cannot reasonably
 predict which answer is correct. And our traffic laws could
 not maintain the predictability that was lost because an
 operating light is a different traffic pattern than a through
 street. That is, Sandoval could not comply with traffic laws
 because no such law envisions this vexing situation. Hence,
 we disagree with the premise that a proper interpretation of
 traffic laws enabled Sandoval and Kinzy to follow the
 instructions simultaneously without issue.
 
 15
 
          ¶29
 To the contrary, the partial malfunction brought about
 simultaneously opposed instructions because it created
 inconsistent suggestions for how to proceed, removing
 predictability for drivers at the intersection, and no
 traffic law applied to harmonize the directions. These
 "conflicting directions" thus initiated a
 confounding scenario for motorists and confused the
 right-of-way at the intersection, creating a dangerous
 condition.
 
 
          ¶30
 Even though our analysis does not hinge on a driver's
 assumption of the right-of-way at the intersection, we
 broadly construe waiver provisions and afford plaintiffs all
 reasonable inferences from their undisputed evidence.
 Dennis, ¶¶ 11, 14, 418 P.3d at 494-95. We
 must thus consider the practical ramifications creating
 confusion and unpredictability. The presented scenario
 confuses the right-of-way and risks causing a collision, as
 in fact what happened here, and our broad construction is
 premised on "compensating victims of governmental
 negligence." Springer, 13 P.3d at 798 (citing
 Corsentino, 4 P.3d at 1086). In applying our broad
 standard, we see it that the directions were inherently
 incompatible, and this incompatibility is exactly the kind of
 simultaneously opposed "conflicting directions"
 that the CGIA waiver contemplates.
 
 
          III.
 Conclusion
 
 
          ¶31
 We hold that under the circumstances, the traffic control
 signals displayed conflicting directions, causing a dangerous
 condition. As a result, Colorado
 
 16
 
 Springs waived its sovereign immunity under the CGIA.
 Accordingly, we reverse the judgment of the court of appeals
 and remand the case for further proceedings consistent with
 this opinion.
 
 
 ---------
 
 
 Notes:
 
 
 [1] We granted certiorari to review the
 following issue:
 
 
 Whether the division of the court of appeals correctly
 interpreted section 24-10-106(1)(d)(II), C.R.S.
 (2024).
 
 
 [2] The CGIA defines a dangerous condition
 as
 
 
 a physical condition of a facility or the use thereof
 that constitutes an unreasonable risk to the health or safety
 of the public, which is known to exist or which in the
 exercise of reasonable care should have been known to exist
 and which condition is proximately caused by the negligent
 act or omission of the public entity.
 
 
 § 24-10-103(1.3), C.R.S. (2025).
 
 
 [3] Colorado Springs takes issue with
 alleged facts in Sandoval's briefing -that construction
 obscured Sandoval's view, and Kinzy drove at a high rate
 of speed -which are not within the district court's
 findings. These allegations are irrelevant to our
 analysis.
 
 
 ---------